UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ERDMAN COMPANY; and ERDMAN ARCHITECTURE & ENGINEERING COMPANY — PLAINTIFFS

VS. — CASE NO. 2:10-CV-2045
*Lead case*

PHOENIX LAND & ACQUISITION, LLC; PHOENIX HEALTH, LLC — DEFENDANTS

ERDMAN COMPANY; and ERDMAN ARCHITECTURE & ENGINEERING COMPANY — THIRD PARTY PLAINTIFFS

VS.

DATA TESTING, INC.; OTIS ELEVATOR COMPANY; and — THIRD PARTY DEFENDANTS

---

PHOENIX HEALTH, LLC; and IPF, LLC — CONSOLIDATED PLAINTIFFS

VS. — CASE NO. 2:11-CV-2067
*Member Case*

ERDMAN ARCHITECTURE & ENGINEERING COMPANY; and OTIS ELEVATOR COMPANY — CONSOLIDATED DEFENDANTS

**ORDER**

Before the Court is Erdman Company and Erdman Architecture & Engineering Company's (together, "Erdman") Motion for Partial Summary Judgment (Fraud and ADTPA Regarding Architect). (ECF No. 190). The Phoenix entities have responded (ECF No. 217), and

Erdman has replied (ECF No. 242). The matter is ripe for the Court's consideration. For the following reasons, the motion will be granted.

**BACKGROUND**

Phoenix Land & Acquisition ("Phoenix") entered into a contract with Erdman Company in December 2007 to design and build a hospital addition in Fort Smith. While drilling a hole to install an elevator on the project, the drilling company breached an abandoned mine shaft, causing subsidence and costly remediation work. That cost, according to Phoenix, left it unable to afford the cost of finishing the project. Phoenix blames Erdman for that mine breach and the ensuing damages. Erdman, Phoenix argues, approved an elevator design that entailed drilling several feet below the depth of its existing geological survey. Had it not done so, or had it done another survey, Phoenix contends, Erdman would not have breached the mine and Phoenix would not have been damaged.

Phoenix also claims that Erdman overbilled on the project. The overbilling allegedly came to several million dollars. Erdman was able to overbill, according to Phoenix, because the architect signing off on Erdman's payment applications, George Myers, was really working for Erdman instead of representing Phoenix's interests. Myers allegedly held himself out as being "independent," but had Phoenix known of Myers's close connection to Erdman, it says it would not have relied on Myers in approving the allegedly overstated payment applications.

Phoenix brings two main claims against Erdman premised on its misunderstanding of Myers and Erdman's relationship. First, it argues that Erdman and Myers fraudulently misrepresented their relationship. Second, it argues that the misrepresentation also violated the Arkansas Deceptive Trade Practices Act. Erdman now moves for summary judgment on those

claims, arguing that the undisputed facts show that Erdman and Myers did not conceal their relationship, and that Phoenix could not legitimately have been misled about it.

**STANDARD OF REVIEW**

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). *See also Agristar Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for

summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

### I. Fraudulent misrepresentation

An Arkansas fraudulent misrepresentation claim requires proof of: (1) a false representation of material fact; (2) knowledge by the maker that the representation is false; (3) the maker's intent to induce action in reliance on the representation; (4) the hearer's justifiable reliance on the representation; and (5) damages caused by that reliance. *Hampton v. Taylor*, 318 Ark. 771, 777, 887 S.W.2d 535, 539 (Ark. 1994). Proof must be by a preponderance. *Id.*

Assuming all of the other elements are met, here the Court still finds as a matter of law that "a jury could not [conclude] reasonably that [Phoenix] justifiably relied on [Myers]'s alleged misrepresentations" in the face of overwhelming evidence that the representations were false. *McAnally v. Gildersleeve*, 16 F.3d 1493, 1494 (8th Cir. 1994).[1]

"Justifiable reliance is an important element of fraud and the absence of proof" on that element causes plaintiff's fraud claim to fail. *First Financial Fed. Savings & Loan v. E.F. Hutton Mortg. Corp.*, 652 F. Supp. 471, 474 (W.D. Ark. 1987). The reliance standard for misrepresentations by positive statement and ones by silence are slightly different. *Lane v. Midwest Bancshares Corp.*, 337 F. Supp. 1200, 1208 (E.D. Ark. 1972). A party relying on misrepresentation-by-silence must show "that the ascertainment of the undisclosed fact was not within the reach of the [party]'s diligent attention or observation." *Brookside Village Mobile Homes v. Meyers*, 301 Ark. 139, 142, 782 S.W.2d 365, 367 (Ark. 1990).

---

[1] In assuming that Myers actually made a misrepresentation, the Court is merely taking the facts in Phoenix's favor, as it must do at the summary-judgment stage. *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). The Court takes no opinion on the truth of Phoenix's claim that Myers actually made a misrepresentation.

A party relying on an affirmative misrepresentation must show that, exercising ordinary care, it did not nor should not have known that the information was false. *Union County v. Piper Jaffray & Co.*, 741 F. Supp. 2d 1064, 1112 (S.D. Iowa 2010) (quoting *Pollman v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 410 (Iowa 1997)). Indeed, it is justifiable reliance, not blind reliance, that is required. *Id.* (quoting *Spreitzer v. Hawkeye St. Bank*, 779 N.W.2d 726, 737 (Iowa 2009)). And where an oral representation contradicts a written one, "reliance on the oral representation…can be utterly unjustified in the face of a clear written contradiction." *Id.* (quoting *Spreitzer*, 779 N.W.2d at 726) (internal citations omitted). In sum, "a plaintiff must 'observe the obvious[.]'" *Waldner v. Carr*, 618 F.3d 838, 847 (8th Cir. 2010) (quoting *Spreitzer*, 779 N.W.2d at 737).

In this case, there could be no misrepresentation-by-silence. That is because Phoenix's contract with Erdman disclosed, in both its terms and its nature, the fact that the design work would be provided by Erdman's employees or its wholly owned subsidiary.

First, the contract's terms disclosed that Erdman's subsidiary would provide design services. Under the subsection titled "Basic Design Services," the contract stated:

> 11.1.2. Design services shall be provided through qualified, licensed design professionals employed by or selected and paid by Design-Builder. Persons, other than employees of Design-Builder, or entities providing Design-Services to the Project under a subcontract with Design-Builder are as follows:
>
> **MEA1, Inc. (a wholly owned subsidiary of Marshall Erdman & Associates, Inc.) d/b/a MEA 1, Inc. of Wisconsin–Architectural and Engineering Services.**

(ECF No. 198-1, at 19-20). Thus, Phoenix was on notice that the default contract situation was for Erdman, through its employees or subcontractors, to provide design services, and that Erdman's wholly owned subsidiary was the design subcontractor of choice.

Second, the fundamental nature of design-build contracts, the type of contract Erdman and Phoenix had, put Phoenix on notice that design services would be arranged and controlled by the contractor. "The essence of the design-build process is that the owner contracts with one entity responsible for both the design and construction services." Philip L. Bruner & Patrick J. O'Connor Jr., 2 *Bruner & O'Connor on Construction Law* § 6:34 (2012). In fact, Ed Hickman, Phoenix's representative, chose the design-build model precisely to avoid designer–contractor disputes by combining those entities. Speaking of such disputes, Hickman said in his deposition: "And I didn't want that conflict, so I thought, if we went with a design build, they would at least be the same entity that I could talk to to try to work out a dispute." (ECF No. 198-1, at 11). Dr. Keith Bolyard, another of Phoenix's representatives, also stated that the reason Erdman was selected for the project was "to put the design part and the build part closer together, to use that type of firm as opposed to—as opposed to what we had before." (ECF No. 198-2, at 16).

Of course, although design-build contracts are growing in popularity, one of their downsides is obvious: they "leav[e] the owner with no real advocate in the design or construction process[.]" Bruner, 2 *Bruner & O'Connor on Construction Law* § 6:15; *see also* Mark C. Friedlander, *A Primer on Industrial Design/Build Construction Contracts*, 14 CONSTR. LAWYER 3, 3 (1994) ("[I]n a plan-and-spec relationship, the design professional has a business incentive to report to the owner any problems observed with the contractor or the construction, whereas in a design/build relationship, the opposite incentive often exists."); Susan Linden McGreevy, *What You Need to Know About Design-Build Contracts*, 18 PRACTICAL REAL ESTATE LAWYER 7, 15 (2002) ("In the past, [owners] have turned to the design professionals to be their agents, their eyes and ears, their advocates. In design-build, that design professional is now on the other side of the table.").

Based on the contract's nature and terms, then, Phoenix was on notice that the default relationship between Erdman and the project designer would be a close one; indeed, that it would be one of explicit association. Therefore, to make out a fraudulent misrepresentation claim, Phoenix must show more than mere silence—it must show an affirmative misrepresentation.[2]

Phoenix claims that such a misrepresentation came from designer George Myers. According to the summary-judgment affidavit of Ed Hickman, Myers "held himself out at all times to be independent of the contractor," and made "statements and representations that he was an independent architect[.]" (ECF No. 225, at 5; 8). That is the closest Phoenix gets to alleging any specific affirmative statement on which they could rely in believing that Myers was independent of Erdman and was protecting Phoenix's interests.

However, even assuming Myers did claim to be an independent architect, Phoenix could not justifiably have relied on that claim in the face of all that it knew. First, Hickman knew that Myers worked for Erdman, at least in the design part of the firm. Part of his cross-examination deposition testimony went as follows:

Q. And who did you understand George Myers to be employed by?

A. The design part of the firm, whichever part that was, because he's in the design.

(ECF No. 198-3, at 25).

---

[2] The testimony and report of James Atkins, Phoenix's architectural expert, does not support a contrary conclusion. Atkins's position on this issue seems to be that, although the contract between Erdman and Phoenix was labeled "design build contract," and although MEA1 was listed as a wholly owned subsidiary of Erdman, and although both of Phoenix's representatives stated that they intentionally chose a design-build model so that there would be only one point of contact, nevertheless Myers and MEA1 *behaved* at times like they were providing "normal architectural services," and Phoenix was therefore entitled to see Myers as an ordinary architect unconnected with Erdman. (ECF No. 224-14, at 6-9). On top of that, Atkins claims that by acting at times like a normal architectural firm, even in the face of explicit evidence that it was not one, Myers and MEA1 became obligated to disclose their conflict of interest with Erdman. (ECF No. 224-14-, at 8). However, in light of the fact that the contract *presumed* a conflict of interest between Myers and Erdman, the Court finds as a matter of law that no disclosure was required above what was in fact given.

Q. …You did know, didn't you, that George Myers was an employee of what is today called Erdman Company?

A. I knew that George Myers was the employee of the design part of Erdman Company….

(ECF No. 198-4, at 13). Moreover, Hickman admitted on cross-examination that the signature block on Myers's emails said: "George Myers, AIA, Senior Project Design Manager, Marshall Erdman & Associates." (ECF No. 198-4, at 13).

Dr. Bolyard also admits to understanding that Myers and Erdman were connected. First, when asked if he knew what counterclaims Phoenix was bringing against Erdman in this case, among the claims Dr. Bolyard stated was: "There's design—faulty design by the architect side of Erdman." (ECF No. 198-2, at 14). Dr. Bolyard also refers to Erdman being hired "as the contractor and the architect." (ECF No. 198-2, at 15).

In the face of this evidence, Phoenix should have known, exercising ordinary care, that any claim of independence by Myers was patently false. Phoenix could not, as a matter of law, have justifiably relied on that misrepresentation. Accordingly, Erdman is entitled to summary judgment on Phoenix's fraudulent-misrepresentation claim regarding Myers's approval of overstated payment applications.

**II. Arkansas Deceptive Trade Practices Act**

For its ADTPA claim, Phoenix relies on the statute's catch-all provision, which prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." ARK. CODE ANN. § 4-88-107(a)(10); *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295, 985 S.W.2d 299, 302 (Ark. 1999). Phoenix argues that the same misrepresentation by Myers and Erdman that supports its fraudulent-misrepresentation claim also

constituted a false or deceptive business practice. Like its misrepresentation claim, Phoenix's ADTPA claim must rest on an affirmative statement, since the default contract situation in this case presumed a connection between Myers and Erdman.

The ADPTA's catch-all provision was intended to encompass more than just traditional fraud. *Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 778–79 (8th Cir. 2010). For that reason, justifiable reliance, the missing element that dooms Phoenix's fraudulent-misrepresentation claim, is not an element of a catch-all deceptive-trade-practices claim. *See Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 13 (Minn. 2001) (Under Minnesota's similar consumer-protection statute, "it is not necessary to plead individual consumer reliance[.]").

However, while reliance is not an element, causation is. *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 666 (8th Cir. 2009). Moreover, in certain cases reliance is so wrapped up in causation that it must in fact be proved as a predicate to showing causation. As in this case, "where…plaintiffs allege that their damages were caused by deceptive, misleading, or fraudulent statements or conduct in violation of the [consumer protection] laws, as a practical matter it is not possible that the damages could be caused by a violation without reliance on the statements[.]" *Group Health Plan*, 621 N.W.2d at 13. "Because [Erdman] here allegedly made an affirmative misrepresentation and [Phoenix] could prove [it] sustained damages…only by demonstrating [it] relied upon a [statement], the Court concludes causation includes reliance in this case." *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009).

Applying that law, the question becomes whether a reasonable jury could conclude on the facts of this case that Phoenix relied on Myers's alleged claim to be an "independent" architect in making the overstated progress payments Erdman requested. It is possible, though unlikely, for

Phoenix to have actually relied on Myers's statements even if that reliance was unjustified; Phoenix could have willfully ignored all the signs of Myers's affiliation with Erdman. However, the deposition testimony of Dr. Bolyard belies that possibility and precludes a reasonable jury from finding reliance—even actual reliance—in this case.

In his deposition cross-examination, Dr. Bolyard was asked if he had any problem with the way the amount of the first 13 payment applications was calculated. Dr. Bolyard responded: "We had no reason to dispute it. One of their employees signed it and one of their architects signed it and it was true and certified, and so we shouldn't have any reason to dispute it." (ECF No. 198-2, at 47). "Their" refers to Erdman. Dr. Bolyard is saying, in other words, that while knowing that one of Erdman's architects signed the pay application, Phoenix had no reason to dispute the payment amount.[3] Thus, even if Myers falsely claimed to be independent of Erdman, Phoenix still considered the architect signature on the payment applications to have come from Erdman's architect, and even considering that fact, Phoenix claims to have had no reason to dispute the amount.

Phoenix's damages claim is essentially that, had it known Myers was not independent of Erdman, it would not have paid the payment applications. Dr. Bolyard's testimony says otherwise: it says that the approval of an Erdman architect gave no reason to dispute the payment amount. In fact, Dr. Bolyard's testimony implies that the approval of an Erdman architect *removed* any cause for disputation.

On that testimony, the Court finds that no reasonable jury could find reliance.

[3] Phoenix does argue that it later had reason to dispute the amount on the applications, but Dr. Bolyard acknowledges that at the time Erdman submitted the applications, the fact that Erdman's architect approved it gave them no reason to dispute it.

## CONCLUSION

For the above reasons, the Court finds as a matter of law that Phoenix could not justifiably have relied on Myers's claim to be independent of Erdman, and that no reasonable jury could find that Phoenix actually did rely on Myers's statements when it approved Erdman's payment applications. Those two findings cause Phoenix's fraudulent-misrepresentation and ADTPA claims regarding Myers's relationship with Erdman to fail. Accordingly, the Court finds that Erdman's Motion for Partial Summary Judgment (Fraud and ADTPA Regarding Architect) (ECF No. 190) should be and hereby is **GRANTED**. Phoenix's fraud and ADTPA claims regarding Myers and Erdman's relationship are hereby **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED, this 17th day of July, 2013.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge