UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ERDMAN COMPANY; and ERDMAN
ARCHITECTURE & ENGINEERING
COMPANY                                                                    PLAINTIFFS

VS.                              CASE NO. 2:10-CV-2045
                                 *Lead case*

PHOENIX LAND & ACQUISITION, LLC;
PHOENIX HEALTH, LLC                                                         DEFENDANTS

ERDMAN COMPANY; and ERDMAN
ARCHITECTURE & ENGINEERING
COMPANY                                                      THIRD PARTY PLAINTIFFS

VS.

DATA TESTING, INC.;
OTIS ELEVATOR COMPANY; and                        THIRD PARTY DEFENDANTS

_____

PHOENIX HEALTH, LLC; and
IPF, LLC                                                    CONSOLIDATED PLAINTIFFS

VS.                              CASE NO. 2:11-CV-2067
                                 *Member Case*

ERDMAN ARCHITECTURE &
ENGINEERING COMPANY; and
OTIS ELEVATOR COMPANY                              CONSOLIDATED DEFENDANTS

## **ORDER**

Before the Court are summary judgment motions filed by Otis Elevator Company ("Otis") (ECF No. 170), Erdman Company, and Erdman Architecture & Engineering Company (together, "Erdman") (ECF Nos. 185 & 234). Both motions concern the Phoenix entities' damages claims. Phoenix has responded (ECF No. 248), and Erdman and Otis have replied.

(ECF Nos. 255 & 256). The matter is ripe for the Court's consideration. For the following reasons, the motions will be denied.

## BACKGROUND

To understand the pending motions, some fairly extensive background is necessary. This dispute involves a group of doctors—the Phoenix entities—who set out to build and run their own surgery hospital. "Phoenix Land & Acquisition" ("Phoenix Land") contracted with Erdman for the design and construction of the project. Erdman subcontracted the elevator installation work to Otis. Otis then subcontracted the required drilling work to Long's Drilling.[1]

The project encountered a problem in July 2008. While drilling a hole to install an elevator, Long's Drilling breached an abandoned mine shaft no one knew existed. The mine shaft breach damaged other parts of the project and had to be fixed at great expense to Phoenix. Phoenix argues that Erdman and Otis's negligence caused the breach and resulting damages.

Phoenix Health ("PH"), a group mostly of orthopedic doctors, purchased land in Fort Smith in February 2004. PH planned to build a medical complex on the land, consisting primarily of a specialty hospital and a medical-office building and, later, an urgent-care center. The plan was to build the hospital first, but the last-minute imposition of certain regulations made that impractical. Accordingly, PH decided to build the office building first.

Erdman was hired to design and build the office building. It was hired in November 2005 and finished the building in October 2006. Erdman was also hired in November 2005 to build an ambulatory surgery center ("ASC"). The ASC was finished in December 2006.

Several sub-entities of Phoenix had roles in the above projects. Phoenix Health *leased* the land in two tracts to Phoenix Land, another legal entity made up of mostly orthopedic surgeons. Phoenix Land was the actual entity that hired Erdman to build the project. One of the tracts was

---

[1] All claims against Long's Drilling have been voluntarily dismissed. (ECF Nos. 209 & 221).

used for the office building, and another for the ASC. When the ASC was finished, it was operated by "Phoenix Health Associates of Fort Smith" ("PHA"), which the Court assumes to be another entity of doctors.

In mid-2006, the regulatory impediment to the specialty hospital was removed, and Phoenix Land decided to go ahead with their plan to build it. The specialty hospital was to be built as an *addition* to the existing ambulatory surgery center. The plans allowed for a future second-floor expansion, to accommodate a possible group of OB/GYN doctors who were thinking of joining the venture. The plan was for Phoenix Land to own and operate the hospital *building* and for a new entity to own the hospital *operations*.

The OB/GYN doctors opted to join the venture shortly after Phoenix Land signed the contract with Erdman for the hospital addition. These OB/GYNs, along with the orthopedic doctors making up Phoenix Land, subsequently formed IPF, LLC. IPF was not technically a legal replacement for Phoenix Land, but it was meant to serve the same function and to supplant Phoenix Land as a practical matter.  As a replacement for Phoenix Land, IPF became Phoenix Health's lessee on the property.

When the hospital was finished, the group of doctors would practice out of that facility and would offer inpatient services on top of the outpatient services the ASC already offered. The group of doctors did in fact practice out of the ASC for a time, in addition to seeing patients through privileges at area hospitals. Because the hospital project fell apart prior to completion, they never had the opportunity to practice out of the new facility.

Although plan expansions, including the second floor, pushed the contract price from its original $13.25 million dollars to upwards of $30 million, the doctors expected the new venture

to be profitable. Several studies projected that the annual profits would be between $3.4 million to $9.6 million.

Phoenix Land paid for the hospital addition through financing. The initial financing came from Benefit Bank, but in September 2008, roughly a couple months after the mine shaft incident, Benefit Bank informed Phoenix Land and IPF that it could no longer finance the project.  After that, IPF worked out a financing arrangement with Bank of the Ozarks, but that deal was conditioned on IPF finding a suitable corporate partner. The only partner IPF came close to partnering with was Cirrus Health. Cirrus and IPF had a tentative partnership arrangement that involved several ownership transfers between existing and newly created sub-entities. The complex details of that arrangement are not important here.  The most important point is that the end result would have been for Cirrus and IPF to essentially split ownership of all aspects of the ASC and hospital addition 50–50.

The Cirrus deal ultimately fell through due to Cirrus's concerns about the cost and viability of the project.  There is some dispute about whether Cirrus's concerns were directly related to the cost of repairing the mine shaft.  In a November 2009 letter to Phoenix, Cirrus stated that "a number of prior expenditures" drove the cost of the project "beyond achievable returns for a successful investment…."  The letter went on to say that Cirrus was concerned that the project would not be commercially financeable due to "a lack of physician equity, lack of a tenant for the second floor, and the non-preservation of lender lien rights."  The mine shaft repair costs were not specifically cited in Cirrus's letter, but Phoenix representatives have testified that the cost of repairing the mine breach came up in discussions with Cirrus representatives prior to the deal falling through.  A Cirrus representative has also testified that the mine breach was a factor in their decision not to partner with Phoenix.

When a partnership with Cirrus did not come to fruition, Phoenix was left unfinanced. As a result, Phoenix Land stopped paying Erdman to finish the project. Erdman walked off the job and filed liens on the project, and Phoenix Health, the landowner, was forced to sell to St. Edward Mercy Health System, Inc. in 2011. That sale, according to Phoenix, was for much less than the property would have been worth were the project completed.

The Phoenix entities allege that the negligence of Erdman, Otis Elevator (Erdman's subcontractor), and Data Testing (which Erdman hired to do a geological survey) was responsible for the mine collapse and ultimate failure of the project. Phoenix has sued for damages, including lost profits and diminution in land value. Erdman and Otis contend that Phoenix is not entitled to those damages for several reasons. They now ask the Court to grant them summary judgment declaring Phoenix barred from those damages.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established.  The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995).  The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). *See also Agristar Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Mgmt.*

*Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986).  A fact is material only when its resolution affects the outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id*. at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

Erdman and Otis give two reasons why Phoenix should be precluded from seeking lost-profit and diminution damages: (1) Otis and Erdman did not cause the damages; and (2) the damages are too speculative.  Phoenix disagrees.

### I.      Whether Phoenix and Otis caused the damages

Phoenix claims that Otis, Erdman, and Data Testing's negligent actions involving the mine shaft prevented Phoenix from securing financing for the hospital project, thereby causing the project to fail and damages to be incurred.  Erdman and Otis maintain that their alleged actions and the costs related to repairing the mine did not cause the hospital project to fail.

To establish causation in a negligence action, a plaintiff must show that a defendant's actions produced injury "in a natural and continuous sequence" and that the injury would not have happened but for the defendant's actions.  *Ouachita Wilderness Inst., Inc. v. Mergen*, 329

Ark. 405, 414 (Ark. 1997).  Arkansas courts have consistently recognized that proximate cause is typically a question for the jury.  *Id.  See also St. Louis Sw. Ry. Co. v. White*, 302 Ark. 193, 199 (Ark. 1990).  "Proximate cause becomes a question of law only if reasonable minds could not differ."  *Id.*

Otis and Erdman argue that no proximate cause exists in this case because Phoenix's inability to secure financing for the project had little to do with the mine shaft breach and the costs resulting from it.  They maintain that the hospital project would have failed regardless of their actions.  In support of this claim, Otis and Erdman point to the letter sent by Cirrus Health, Phoenix's last hope of obtaining financing, explaining its reasons for backing out of a partnership arrangement with Phoenix.  Cirrus Health's letter does not specifically mention the costs of repairing the mine as a reason for not partnering with Phoenix.  Rather, the letter generally refers to "a number of prior expenditures" and "a lack of physician equity, lack of a tenant for the second floor, and the non-preservation of lender lien rights."

Despite what was or was not included in the letter, Phoenix maintains that the cost of repairing the mine was a "deal-breaker" for Cirrus Health.  Phoenix representatives have testified that when Cirrus Health began crunching the numbers on the project, the cost of the mine repair surfaced as a sticking point.  (ECF No. 198, Exh. 3, p. 30; ECF No. 198, Exh. 2, p. 52).  According to these representatives, a deal with Cirrus Health was contingent on Cirrus not carrying any of the mine repair costs.  Cirrus Health's representative, Barry Smith, testified that, while the mine repair costs were not the only reason for the deal falling through, they were certainly a "significant" factor in the decision.  (ECF No. 250, Exh. 11, p. 2).  Smith stated that, had the mine repair costs been removed from consideration, discussions with Phoenix would have "moved [] down the road."   *Id.*

In viewing the facts above in a light most favorable to the non-movant, the Court finds that there is sufficient evidence to submit this question of proximate cause to a jury. The Court recognizes that mine repair costs may not be solely to blame for the failure of the project. Nonetheless, Phoenix has submitted sufficient evidence to create an issue of fact regarding the cause of its lost financing and its loss of Cirrus Health as a potential partner.

## II.    Whether the damages are speculative

The Phoenix entities are pursuing damages for both lost profits and diminution of property value and sales price. The overarching rule of lost-profit damages is that they must not be arrived at through speculation. If speculation is required, the damages are disallowed. *Boellner v. Clinical Study Centers, LLC*, 2011 Ark. 83, at 15, 378 S.W.3d 745, 755. It must be reasonably certain, based on a reasonably complete set of figures, that the plaintiff would have profited if the deal had gone as the parties intended. *Little Rock Wastewater Util. v. Larry Moyer Trucking, Inc.*, 321 Ark. 303, 312, 902 S.W.2d 760, 766 (Ark. 1995); *Ishie v. Kelley*, 302 Ark. 112, 114, 788 S.W.2d 225, 226 (Ark. 1990). That certainty is more important in proving that lost profits actually occurred than it is in proving the specific amount of profit that was lost. *Acker Constr., LLC v. Tran*, 2012 Ark. 214, at 11, ——S.W.3d——. Stated another way, as long as it is "reasonably certain" that lost profits have occurred "it is enough if they can be stated only proximately." *Dr. Pepper Bottling Co. of Paragould v. Frantz*, 311 Ark. 136, 144 (Ark. 1992). Moreover, loss may be determined in any manner reasonable under the circumstances, *Tremco, Inc. v. Valley Aluminum Prods. Corp.*, 38 Ark. App. 143, 146, 831 S.W.2d 156, 158 (Ark. Ct. App. 1992); and it is the net, rather than the gross, revenues that counts. *Cinnamon Valley Resort v. EMAC Enterprises, Inc.*, 89 Ark. App. 236, 246, 202 S.W.3d 1, 7 (Ark. Ct. App. 2005).

Erdman and Otis contend that, because Phoenix was a new business with no track record of profitability, Phoenix is automatically banned by Arkansas's purported "new business rule" from seeking lost profit damages.  In the alternative, if the Court finds that there is no *per se* rule against Phoenix seeking lost profit damages, Erdman and Otis offer a number of reasons why Phoenix's lost profit calculations are too speculative.

**a.     The "new business rule"**

Erdman and Otis rely on *Marvell Light & Ice Co. v. Gen. Elec. Co.*, 162 Ark. 467 (Ark. 1924) for the proposition that, as a new business, Phoenix is not entitled to recover damages for lost profits.  *Marvell* states that "the anticipated profits of [a] new business are too remote, speculative, and uncertain to support a judgment for their loss." *Id.*  Erdman and Otis argue that this statement amounts to a *per se* rule banning the recovery of lost profits for new businesses. Phoenix, on the other hand, contends that there is no *per se* rule and that the age of a business is only a factor to be considered when determining whether lost profits damages are excessively speculative.

A minority of states subscribe to the "new business" rule when determining whether lost profit damages may be recovered.[2]  For those applying the rule, once it has been determined that a business can be classified as "new," as opposed to "established," damages for lost profits become unavailable.  The logic behind the rule is certainly understandable—when there is no provable data of past profits from an established business, predicting future profits becomes a more speculative endeavor.  Even so, the majority of courts have rejected a *per se* rule and have recognized that flexibility is needed in determining whether lost profit forecasts are overly

---

[2] The "new business" rule appears to still be in force in Georgia, Illinois, and New Jersey.  *See Dominion Nutrition, Inc. v. Cesca*, 467 F. Supp. 2d 870, 883-84 (N.D. Ill. 2006); *RSB Lab. Servs. Inc. v. BSI Corp.*, 847 A.2d 599, 609-612 (N.J. Sup. Ct. 2004); *Lowe's Home Centers, Inc. v. General Elec. Co.*, 381 F.3d 1091, 1096 (11th Cir. 2004); *Blair-Naughton L.L.C. v. Diner Concepts, Inc.*, 369 F. App'x 895, 904 (10th Cir. 2010).

speculative in the context of a new business.  *See* Robert L. Dunn, *Recovery of Damages for Lost Profits* § 4.3 (6th ed. 2005) (collecting cases).  In these courts, the newness of a business "enters into judicial consideration of the damages claim not as a rule but as a factor in applying the standard."  *MindGames, Inc. v. W. Pub. Co., Inc*., 218 F.3d 652, 658 (7th Cir. 2000).  The issue before the Court is whether Arkansas adheres to this widely accepted flexible approach or the *per se* application of the new business rule.

The new business rule, as articulated by the *Marvell* court in 1924, has never been cited to or relied upon by another Arkansas court.  Nor has it been overruled.  However, the *Marvell* decision has been thoroughly examined by the Seventh Circuit Court of Appeals in *MindGames, Inc. v. W. Pub. Co., Inc*., with Chief Judge Richard Posner writing for the majority.  *Id*.  The court rightly noted that in a federal case where state law applies, "the federal court must predict how the state's highest court would decide the case, and decide it the same way."  *Id*. at 655-56.  *See also* 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4507, pp. 123-50 (2d ed.1996) ("…Erie presumably directs the federal courts to decide a state law issue as it would have been decided had the case been brought in the state court system, which includes a court of last resort that is able to change state law…").  Applying that principle, the court found that the Arkansas Supreme Court would likely not follow the *per se* new business rule that was purportedly set out in *Marvell*.  *MindGames, Inc.* at 656.  In support of this conclusion, the court took notice of the fact that the new business rule had not been applied in a *per se* manner in Arkansas post-*Marvell*.  *Id*. The court also expressed doubt that the *Marvell* opinion even intended to foreclose the possibility of lost profit

damages for *every* new business.[3]  *Id.* at 655. Most importantly, the court recognized that "Arkansas cases decided since *Marvell* that deal with damages issues exhibit a liberal approach to the estimation of damages that is inconsistent with a flat rule denying damages for lost profits to all businesses that are not well established." *Id.*  *See also Acker Const., LLC v. Tran*, 396 S.W.3d 279, 288 (Ark. Ct. App. 2012); *Jim Halsey Co. v. Bonar*, 683 S.W.2d 898, 902-03 (Ark. 1985); *Tremco, Inc. v. Valley Aluminum Products Corp.*, 831 S.W.2d 156, 158 (Ark. Ct. App. 1992); J.W. Looney, *The 'New Business Rule' and Breach of Contract Claims for Lost Profits: Playing MindGames with Arkansas Law*, 1997 Ark. L. Notes 43, 46-47 (1997).

The Court is inclined to agree with the Seventh Circuit's analysis regarding the state of the new business rule in Arkansas.  Assuming *arguendo* that the *Marvell* court's statement was intended as a blanket rule extending beyond the specific facts of that case, close to 90 years of intervening law suggests that Arkansas has taken a more flexible approach to the award of lost profit damages.  If faced with this question today, the Arkansas Supreme Court would likely follow the lead of the other states that have abandoned the new business rule and find that a business's age and lack of track record are simply factors to be considered when determining whether lost profit damages are too speculative.

### b.      Whether Phoenix's lost profit damages are too speculative

Because the Court has determined that there is no *per se* ban on a new business obtaining lost profit damages, the question is now whether Phoenix's alleged damages are too speculative to survive summary judgment.  Erdman and Otis argue that Phoenix's lost profit projections are

---

[3] While the *Marvell* quotation at issue "is taken to have made Arkansas a 'new business' state… the rest of the *Marvell* opinion indicates that the court was concerned that the anticipated profits of the particular new business at issue, rather than of every new business, were too speculative to support an award of damages."

speculative due to Phoenix's lack of profitable history and the unreliable methodology used to project lost profits in this case.[4]

As evidence of lost profits, Phoenix has submitted multiple pro formas, including one generated by Erdman, which forecast the completed hospital earning a yearly net operating income of anywhere between $3.4 million to $9.6 million.  (ECF No. 251, Exh. 2-3).  Phoenix has also submitted an expert report and financial pro forma completed by Bryan Cali for the purpose of this litigation.[5]  (ECF No. 251, Exh 1).  Because the methodology and numbers used in the Cali pro forma are explained at length, the Court has principally relied on this report in considering the present motion.  This report is described by Cali as a "reasonable 2010 financial pro forma reflecting the potential hospital operations assuming the hospital was opened and licensed according to the original timing in early 2009."  (ECF No. 251, Exh 1, p. 3).  The report is largely based on a comparative analysis of: similar physician owned hospitals; Phoenix's ambulatory surgery center patient volume; and Phoenix's physician shareholder patient volumes in other hospitals.

Cali's report concluded that the hospital operation in 2010, the first full year of anticipated hospital operations, would yield an EBITDA (earnings before interest, taxes, depreciation, and amortization) of $11,535,678.  This amount represents 27% of the hospital's potential net surgical revenue.  Cali reports that this profit margin falls just below the median profit margin for 16 other hospitals who met his comparison criteria.

---

[4] Erdman and Otis also contend that lost profit damages are speculative because of the possibility that Phoenix would lose its financing for reasons unrelated to the mine shaft incident.  Essentially, Erdman and Otis are making their previous negligence causation arguments in a slightly different context.  As explained above when addressing Phoenix's negligence claims, the Court finds that the factual circumstances surrounding Phoenix's potential financing arrangements (or lack thereof) are contested enough to survive summary judgment.

[5] Bryan Cali is the Director of healthcare practice at the Chicago office of Navigant Consulting.

While it is not necessary at this time for the Court to go into great detail regarding Cali's methodology in coming to this profit margin, a few basic figures are worth noting.  The potential inpatient volumes, outpatient volumes, and operating expenses are the most pertinent figures for the Court's purposes.  The report's outpatient volumes for 2010 reflect the actual outpatient volumes for Phoenix's ambulatory surgery center in 2010.  In other words, the report assumes that the outpatient volume of the hospital expansion would be comparable to the outpatient volume from Phoenix's ambulatory surgical center.  The report's inpatient volumes are based upon the 2010 inpatient volumes of Phoenix's physician shareholders (i.e. the physicians expected to operate out of the new hospital) produced at other Forth Smith area hospitals.

The hospital expenses in the report are based upon specific information provided by Phoenix and Erdman and Cali's own experience with comparable physician-owned hospitals. The report notes that "rent and facility operating expenses were derived from data provided by [Erdman] to representatives of Phoenix on January 10, 2008….Expenses related to the land lease are based on the lease agreement entered into between Phoenix Health, LLC and IPF, LLC." *Id.* at 18.  In sum, Cali concluded that expenses would amount to 72.5% of the hospital's revenue.

Based upon the facts and figures above, which are viewed in the light most favorable to Phoenix, the Court finds that summary judgment as to Phoenix's lost profit claim is not appropriate.  There is at least some competent, statistical evidence to support Phoenix's claim of lost profits, despite the fact that this hospital was a new business.  While the evidence as summarized above is enough to withstand summary judgment, this does not mean that Phoenix has carried its burden of proving that it is reasonably certain that lost profits have occurred.  The Court will reserve its judgment on that matter until after Phoenix has had the opportunity to

present evidence at trial.[6]  Phoenix's proof of lost profits will be subject to the rules of evidence and any sustainable objections by Erdman and Otis.  The evidence actually admitted will determine whether Phoenix has proven lost profit damages to the extent that they may be considered by the jury.[7]

## CONCLUSION

For the above reasons, the Court finds that the summary judgment motions filed by Otis Elevator Company (ECF No. 170) and Erdman (ECF No. 185) should be and hereby are **DENIED**.

IT IS SO ORDERED, this 18th day of July, 2013.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

---

[6] This reservation of judgment includes Erdman's claims that IPF, Inc., one of the Phoenix entities, was not an entity that would have been a part of the Cirrus partnership deal.  Erdman contends that there can be no reasonable certainty that IPF would have experienced lost profits if they were never an intended party to the failed Cirrus arrangement.  Phoenix maintains that all of the testimony by its witnesses demonstrates that IPF was a part of the Cirrus deal and that IPF was intended to receive profits from the hospital once it was completed.  Evidence regarding this dispute may be presented at trial.

[7] In this opinion, the Court has generally referred to "Phoenix" entities having the right to put on evidence of lost profits at trial.  However, the Court has previously determined that Phoenix Land & Acquisition is limited as to the consequential damages it can pursue against Erdman Company based on a consequential damages waiver in the parties' contract.  (ECF No. 314).  The Court's previous findings regarding the consequential damages waiver should be read in conjunction with the present order.